**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Sterling and Wilson Solar Solutions, Inc.<br><br>                                            Plaintiff,<br><br>          -against-<br><br>JPMorgan Chase Bank, N.A.,<br><br>           -and-<br><br>Bank of America N.A.<br><br>                                           Defendants. | Civil Action No. 1:23-CV-05711-VEC<br>Civil Action No. 1:23-CV-06024-VEC |

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

FACTS ............................................................................................................................................ 3

      A.      The EPC Agreements ............................................................................................ 3

      B.      Letters of Credit .................................................................................................... 5

      C.      The Owner-Caused Delays and Failures to Pay ........................................................ 5

      D.      Sterling's Performance Under the EPC Agreements ................................................ 8

      E.      The Fraudulent Draw Requests ............................................................................. 8

ARGUMENT .................................................................................................................................. 8

      A.      Sterling Is Likely To Succeed on The Merits ........................................................... 9

            1.    Sterling Was Not In Default of Its Obligations under The EPC Agreements .................................................................. 9

            2.    Owners Were Not Entitled to The Full Amount of the Draw Request ............................................................... 12

      B.      Sterling Faces Irreparable Harm in The Absence of an Injunction ...................... 13

      C.      The Balance of Equities Favors an Injunction ..................................................... 14

      D.      The Public Interest Favors an Injunction ............................................................. 15

CONCLUSION ............................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases**

*3Com Corp. v. Banco do Brasil, S.A.*
  171 F.3d 739 (2d Cir. 1999) .................................................................................................. 13

*3M Co. v. HSBC Bank USA, N.A.*
  2016 WL 8813992 (S.D.N.Y. Oct. 21, 2016) ......................................................................... 13

*ACE Am. Ins. Co. v. Banks of the Ozarks*
  2014 WL 4953566 (S.D.N.Y. Sept. 30, 2014).......................................................................... 13

*All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A.*
  921 F.2d 32 (2d Cir. 1990) ..................................................................................................... 13

*Archer Daniels Midland Co.*
  2011 WL 855936 ..................................................................................................................... 15

*Asa v. Pictometry Int'l Corp.*
  757 F. Supp. 2d 238 (W.D.N.Y. 2010) ............................................................................. 13, 14

*Bowen v. Roy*
  476 U.S. 693 (1986) ................................................................................................................ 15

*Brenntag Int'l Chemicals, Inc. v. Bank of India*
  175 F.3d 245 (2d Cir. 1999)................................................................................................. 8, 15

*Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*
  95 F.3d 153 (2d Cir. 1996)...................................................................................................... 11

*Fluor Daniel Argentina, Inc. v. ANZ Bank*
  13 F. Supp. 2d 562 (S.D.N.Y. 1998)....................................................................................... 13

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*
  152 F. Supp. 3d 90 (E.D.N.Y. 2015)
  *aff'd in part, vacated in part*, 841 F.3d 133 (2d Cir. 2016) ....................................................... 13

*Marvel Ent. Grp., Inc. v. ARP Films, Inc*
  684 F. Supp. 818 (S.D.N.Y. 1988)........................................................................................... 11

*Muze, Inc. v. Digital On-Demand, Inc.*
  123 F. Supp. 2d 118 (S.D.N.Y. 2000)..................................................................................... 13

*Petereit v. S.B. Thomas, Inc.*
  63 F.3d 1169 (2d Cir. 1995) .................................................................................................. 13

*Recon/Optical, Inc. v. Gov't of Israel*
  816 F.2d 854 (2d Cir. 1987) .................................................................................................. 13

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.*
  719 F.2d 583 (2d Cir. 1983) ......................................................................................... 9, 14, 15

*Semetex Corp. v. UBAF Arab Am. Bank*
  853 F. Supp. 759 (S.D.N.Y. 1994) ......................................................................................... 13

*TC Skyward Aviation U.S., Inc. v. Deutsche Bank AG*
  557 F. Supp. 3d 477 (S.D.N.Y. 2021) ..................................................................................... 13

*Williams v. Buffalo Pub. Sch.*
  758 F. App'x 59 (2d Cir. 2018) .............................................................................................. 10

**PRELIMINARY STATEMENT**

Avangrid Inc. and its subsidiaries (collectively, the "Owners") hired Sterling to design and build two large-scale solar facilities, and Sterling delivered on those projects. Today, Owners, confirmed by their own sworn certifications to the local utilities, received two solar plants that are: (1) substantially complete; (2) meet all safety requirements; and (3) are operating at full capacity. Conversely, while Sterling delivered on its end of the bargain, Owners have not. Sterling has received approximately $218 million from Owners but has spent approximately $294 million constructing the fully functional solar plants. Sterling also faces another $22 million in subcontractor liabilities and costs. So today, Owners have two solar plants operating at capacity, plus approximately $98 million in cash that is owed to Sterling. But that is not enough for them. Owners also fraudulently attempted to draw 100% of the letters of credit at issue, falsely claiming an entitlement to another approximately $47 million of Sterling's dollars. Put differently, <u>if the letters of credit draws are enjoined</u>, Sterling faces a $98 million dollar loss caused by Owners' breaches; and <u>if the draws are permitted</u>, Sterling's loss will increase to over $145 million. All the while, Owners are reaping the economic benefits of two fully functioning solar plants.

The solar facilities at issue are nine-figure utility-scale constructions. Pursuant to an industry-standard contract, the parties contemplated the need for work and costs that would exceed the initial contract price. These additional costs could result from changes in Owner directions, site conditions, force majeure events, and/or other events—the costs of which are the Owners' contractual responsibility. The parties' Engineering, Procurement and Construction Agreements ("EPC Agreements") accounted for these "change orders," dictating that Sterling would submit them to Owners for payment, and Owners would in turn pay Sterling. The parties also negotiated for a dispute resolution procedure whereby a court would adjudicate whether either party breached.

While Sterling has advanced the construction and abided by the EPC Agreements, the

Owners repeatedly disclaimed and/or ignored their payment obligations, breaching the EPC Agreements, causing delays, and damaging both the projects' timelines, and Sterling. As the supporting declarations show,[1] despite receiving two fully functioning solar projects, Owners have withheld from Sterling $81 million in change orders that Sterling has submitted. As a result, Sterling is deeply in the red on these projects. Moreover, Owners' failure to pay Sterling has resulted in Sterling's inability to complete its payment obligations to certain subcontractors.

Rather than honoring their obligations and paying for change orders, Owners instead doubled down on their malfeasance by attempting to draw on two letters of credit in the amount of ▇ of the contract value ($47 million). In support of these draws, Owners submitted fraudulent attestations that (1) Sterling failed to perform under the EPC Agreements, and (2) Owners are entitled to the full amount of the letters of credit.

Both attestations are false. ***First***, Sterling's obligation to deliver lien-free projects is conditioned on Owners honoring their payment obligations. Having failed to pay Sterling for change orders, Owners cannot declare that Sterling has failed to perform, particularly as that is for a court to decide under the dispute resolution process. ***Second***, even if Sterling is found to be in breach—and it will not be—Owners' draw would then be capped (at maximum) at half of the value of the letters of credit. The EPC Agreements limit Owners' draws to **REDACTED** for delay damages, **REDACTED** if they have both delay and capacity damages. Because Owners do not dispute that the projects are at capacity, their maximum draw allowance, if anything, is **REDACTED** Owners' representation that they were entitled to draw $47 million was fraudulent.

Sterling faces irreparable harm absent injunction. As more fully set forth herein, the draws,

---

[1] In support of this Reply, Sterling concurrently files the *Declaration of Gaurav Bhandari*, dated July 17, 2023, and the *Declaration of Dilip Ghorawat*, dated July 17, 2023.

if permitted to occur, will necessitate global headcount reductions, increased cost of credit, damaged banking relationships, and many other unquantifiable losses. Both the balance of hardships and public interest favor a preliminary injunction: the Owners will suffer no harm from maintaining the status quo until an evidentiary hearing can be held (which would occur before the letters of credit expire), and courts have held that the public interest supports an injunction because preventing fraud is more important than enforcing drawdown requests.

## FACTS

**A.     The EPC Agreements**

This case involves two solar farms: the Lund Hill project in Washington and the Montague project in Oregon. Both projects are governed by EPC Agreements entered into between Sterling, as Contractor, and Avangrid and its subsidiaries, as Owners. The substantive provisions of the EPC Agreements are generally the same. Under both, Owners agreed to make payments as required, timely approve Sterling's submittals, follow specific procedures for change requests (referred to as "Change Orders"), make adjustments for Change Orders, and avoid acting to prevent Sterling from performing its obligations. *E.g.,* ECF 44-1 §§ 10.1-10.3, 20.3, and definition of "Owner-Caused Delay"; ECF 44-10 §§ 10.1-10.3, 20.3, and definition of "Owner-Caused Delay."

Under the EPC Agreements, Sterling was required to provide standby letters of credit to protect Owners from exposure to certain specific risks. These letters of credit represented, in effect, bonds in the amount of ▇▇▇ of the value of the EPC Agreements. Section 3.21.3 provides that Owner may draw on the letter of credit only under two conditions: (A) a "Contractor Event of Default," in which case Owner may draw down the amount it is owed under the EPC Agreement; or (B) the failure to renew the letter of credit when required, in which case Owner may draw down the "full amount" of the letter of credit. *Id.* § 3.21.3. Here, there are no allegations relative to subpart (B) for failure to renew; the dispute centers around whether there was a "Contractor Event

-3-

of Default." The EPC Agreements control whether—and to what extent—a draw may be made.

***20.1 Contractor Event of Default.*** Section 20.1 outlines "Contractor Event of Default." A delay in "Substantial Completion" may result in a Contractor Event of Default, but Section 20.1 expressly excludes delays as a result of (1) an "Owner Event of Default," (2) a "Force Majeure Event," or (3) an "Owner-Caused Delay," ECF 44-1 § 20.1(f), which are further defined as follows:

- "Owner Event of Default" REDACTED

- "Owner-Caused Delay" REDACTED

- "Force Majeure Event" REDACTED

***16.3 Substantial Completion.*** The requirements for Substantial Completion fall into two categories: (1) technical requirements concerning the design, construction, safety, and capacity of the plant (*id*, §§ 16.3(a)(ii)-(vi), (viii)-(x)); and (2) administrative requirements, such as the notice of Substantial Completion and payment of delay damages, if owed (*id.,* §§ 16.3(a)(i) and (xv)).

Section 16.3(c) makes a distinction between "Punch List Items," which need not be completed before Substantial Completion, and "Critical Items," which are to be corrected before Substantial Completion. *Id.* §§ 16.3(c)(i). If the parties cannot agree on whether an item is a "Punch List Item" or "Critical Item," the dispute "shall be resolved under Article 28," which provides for good faith negotiation and, failing that, resolution by a court proceeding. *Id.* §§ 16.3(i) and 28.2.

***29.2 Liquidated Damages.*** REDACTED

[REDACTED] Owners have not alleged capacity damages in this case. Accordingly, this dispute centers around whether or not delay damages, [REDACTED] of the Contract Price are available to Owners.

**B.      Letters of Credit**

Sterling obtained a letter of credit from JPM for the Lund Hill Project and from BofA for the Montague Project. Under both letters of credit, any drawdown must be accompanied by a certification from Owner attesting to two key representations: (1) Sterling has failed to perform its obligations under the applicable EPC Agreement; and (2) Owner is entitled under the EPC Agreement to the amount of the drawdown request:

> Pursuant to that certain Engineering, Procurement and Construction Agreement between Beneficiary and Sterling . . . [1] [Sterling] has failed to perform its obligations under the Agreement and [2] as a result, the Beneficiary is entitled to payment of an amount equal to [the value of the letter of credit].

ECF 44-8 at 12; ECF 44-15 at 10. The letters of credit require Owners to further attest that:

> The amount specified on the sight draft accompanying this certificate does not exceed the amount which beneficiary is entitled to draft under said agreement [i.e., the EPC Agreement] as of the date hereof.

*Id.* Thus, the letters of credit make clear that Owners may not draw down amounts beyond what they are entitled to under the EPC Agreements.

**C.      The Owner-Caused Delays and Failures to Pay**

Construction began on the Lund Hill project after the Lund Hill EPC was signed in June of 2020. At the time, both parties understood that there would be serious challenges in completing a utility-scale construction project due to the Covid-19 pandemic. Bhandari ¶ 9. Among other issues, Sterling had to contend with government lockdowns, supply chain disruptions, labor shortages, and quarantine procedures. *Id.* However, Sterling worked diligently to resolve issues and advance the project. *Id.* ¶ 13.

Approximately one year into the construction of the Lund Hill project, in March of 2021,


Owners awarded Sterling with a second nine-figure contract to construct the Montague project. However, cracks in the relationship between Sterling and Avangrid began to emerge. Owners breached their contractual duties to pay for "Change Orders" as a result of Covid-19 impacts, permit problems, and other issues for which Owners were contractually responsible. *Id.* ¶ 10-12. By March of 2021, on the Lund Hill project alone, the total cost for these Change Orders amounted to over $35 million. *See* ECF 44-2 & Attachment B thereto at 7. Sterling agreed to amend the Lund Hill EPC with the goal of resolving "the Contractor-Submitted Change Orders" that Owners had failed to address. *Id.* at 1 (Recitals). The amendment increased the Contract Price owed to Sterling for Lund Hill **REDACTED**. *Id.* at 1 ¶ 2(b).

Even after the contract amendment process, Owners quickly reverted back to their breaching conduct vis-à-vis their responses to Change Orders. Subsequent to the contract amendment, when Sterling submitted additional Change Orders resulting from Owner-caused delays and defaults, Owners again breached their contractual obligations by failing to make their contractually obligated payments. Bhandari ¶¶ 11-12. Owners' breaches affected Sterling's ability to pay its subcontractors. *Id.* ¶¶ 23-28.

Despite Owners' breaches, Sterling continued advancing the projects by investing its own money into the projects to resolve subcontractor payment issues. *Id.* However, given Owners' failure to pay for Change Orders, it was a matter of time before the subcontractors took matters into their own hands. And that is exactly what happened. Two subcontractors, Conti and OEG, recorded liens against the projects and initiated foreclosure lawsuits naming Owners as defendants.

Still, Sterling continued putting its own money at risk for the sake of advancing the project and worked diligently to resolve the subcontractor liens, and did get multiple subcontractor liens resolved as of January 2023. *Id.* ¶¶ 24-25. However, as Sterling explained to Owners at that time,

it was incurring serious financial loss and needed Owners to honor their duty to pay for Change Orders so that Sterling could in turn pay subcontractors and avoid further liens. *Id.* ¶ 26 & Exs. 12 and 13. In a discussion between upper management, Sterling clearly explained to Owners that "***[a]ll the liens are direct result of non-payment by Avangrid against our cost claims/variations.***" *Id.* ¶ 27 & Ex. 14 (emphasis added).

These costs have greatly impacted Sterling's cash flow on the projects. As amended, the contract value of the projects is $236 million, but to date Sterling has incurred approximately $316 million in costs—including over $81 million in Change Orders that Owners have refused to pay for—while Owners have only paid $218 million. Ghorawat ¶¶ 17-23. Thus, even before the drawdown Sterling is facing losses of $98 million, and if the $47 million drawdown goes forward, Sterling will have losses of $145 million.

Instead of paying for the Change Orders so that Sterling could pay subcontractors, Owners denied their own responsibility for delays and manufactured false allegations that Sterling failed to perform. Despite these breaches and evasions by Owners, Sterling continued engaging with Owners in good faith, and agreed to continue working on the projects based on express written assurances from Owners that if the parties first worked to complete the projects, then they subsequently would work together to resolve claims for damages afterwards. Bhandari ¶ 29 & Ex. 15. Sterling reasonably relied, to its own detriment, on Owners' assurances. *Id.* ¶ 30.

In June of 2023, after Sterling delivered two fully functional large-scale solar projects that Owners certified to the local energy utilities as substantially complete and fully operational to capacity, Owners pulled the rug out from under Sterling by attempting to draw down ***the full amount of $47 million*** from their letters of credit on both projects. As set forth below, there is no justifiable factual nor legal basis for Owners to have drawn down the full amounts of these letters

of credit, and therefore, the draw demands must be voided as fraudulent.

**D.     Sterling's Performance Under the EPC Agreements**

Sterling has delivered to Owners two fully operational large-scale solar facilities. The deliveries of solar farms by Sterling, which satisfied the necessary "capacity" requirements (as set forth in the Recitals of the EPC Agreements) were confirmed in writing by Owners. For instance, in a sworn Commercial Operation Certificate from October 2022, Owners attested to the local energy utility that the Lund Hill project has "been substantially completed" except for "punch list items" that do not materially affect performance, reliability, or safety. ECF 14-3. In April 2023, Owners provided a similar certification for the Montague Project. *See Sterling v. BANA*, No. 3:23-cv-0110 (M.D. Pa.), ECF 4-2 at 138-141 of 144, *consolidated as* No. 1:23-cv-6024 (S.D.N.Y).

**E.     The Fraudulent Draw Requests**

In June of 2023, Sterling learned that Owners attempted to draw on their letters of credit in full. In support of their draw requests, Owners submitted attestations that (1) Sterling was in default of its obligations under the EPC Agreements, and (2) Owners were entitled to the full amount of the draw requests. As described herein, both of these representations are false.

**ARGUMENT**

Courts in the Second Circuit routinely grant preliminary injunctions where, as here, there is evidence that a beneficiary's demand for payment on a letter of credit was supported by false representations. *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 251 (2d Cir. 1999) (granting preliminary injunction to prevent payment on letter of credit based on evidence that "default letter" accompanying the payment demand contained misrepresentations); *Archer Daniels Midland Co. v. JP Morgan Chase Bank, N.A.*, No. 11 Civ. 0988 (JSR), 2011 WL 855936, at *5 (S.D.N.Y. Mar. 8, 2011). This Court should grant injunctive relief to prevent Owners from fraudulently drawing down on the lines of credit at issue.

A.       **Sterling Is Likely To Succeed on The Merits.**

Sterling will prevail on the merits. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities*, 598 F.3d 30, 35 (2d Cir.2010). In support of their draw requests, Owners submitted two key misrepresentations. The evidence, including Owners' own prior admissions, shows that both of these representations were false.[2]

1.       **Sterling Was Not In Default of Its Obligations under The EPC Agreements.**

Owners admit that they may draw on the letters of credit *only if* they can prove "the occurrence of a Contractor Event of Default" resulting in a "Loss suffered or incurred by the Owner . . . in connection with this [EPC] Agreement." Opposition Brief (ECF 41) ("Opp.") at 4. Owners argue that this was established by Sterling's purported failure to pay subcontractors and failure to achieve Substantial Completion. Opp. at 11-13. These arguments are meritless.

*First*, Owners have only themselves to blame for nonpayment of subcontractors. To the extent Sterling has not paid subcontractors, it is because Owners repeatedly failed to pay Sterling for Change Orders as required. In March 2021, owners agreed to pay an [REDACTED] to Sterling for Owners' failure to accommodate Change Requests up to that point. ECF 44-2 at 1 (Recitals and ¶ 2(b)). But after March 2021, Owners denied valid Change Orders, imposing severe financial hardship on Sterling and causing subcontractors to impose liens on the projects and file lawsuits specifically naming Owners as defendants. Bhandari ¶¶ 26-27, 39-40 & Exs. 12-14, 19.

A party cannot "first cause the default and then attempt to reap the benefit of the guarantee." *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 589 (2d Cir. 1983) (upholding

---

[2] At the very least, Sterling's briefing provides more than enough evidentiary details to satisfy the standard for likelihood of success on the merits, and therefore Sterling requests the maintenance of the status quo for long enough to give the parties an opportunity to take minimal written and oral discovery on an expedited basis, and to conduct an evidentiary hearing on these issues. Sterling believes it could complete expedited discovery in four weeks and could prepare an evidentiary presentation one week following the completion of expedited discovery. The letters of credit remain in effect through September 2023, and therefore Owners will suffer no prejudice should the Court allow a reasonable amount of time for an expedited evidentiary presentation.

preliminary injunction when beneficiary caused the breach). That is particularly true here given that Sterling is responsible for subcontractor liens only "[t]o the extent Owner's payments to Contractor are made in accordance with this Agreement[.]" ECF 44-1 § 21.2. Having failed to pay Sterling more than $80 million in valid Change Orders, Owners cannot be heard to argue that Sterling defaulted on its obligations by not remitting those payments to the subcontractors.

**Second**, Sterling achieved Substantial Completion. Owners do not dispute that Sterling delivered two fully functioning solar plants, satisfying the technical requirements of Section 16.3. Instead, Owners contend that Sterling failed to achieve Substantial Completion because it did not fulfill the administrative requirements of (i) paying alleged delay damages and (ii) giving notice of substantial completion.[3] Sterling disputes that it owes delay damages as any delays are attributable to Owners' failures or Force Majeure events from Covid-19. Bhandari ¶¶ 6, 10-12, 37-39. But even if delay damages had accrued, they would be capped at $23.5 million REDACTED and that must be offset by the at least $81 million that Owners owe Sterling for Change Orders, leaving Owners with a net zero claim to delay damages against Sterling.

Moreover, Owners waived any requirement that Sterling give notice of substantial completion when Owners themselves gave notice to the energy utilities that the Lund Hill project was "substantially completed" except for "punch list items" that do not materially affect performance, reliability, or safety, and made similar representations about the Montague project. Bhandari ¶¶ 17-20, 42-43. By making these representations, Owners themselves certified that the projects were substantially complete, releasing any contractual requirement that Sterling do the same. *See, e.g., Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63 (2d Cir. 2018) (contractual

---

[3] The Owners also contend, **without citing any evidence** other than the contracts, that Sterling "failed to remedy defective work" in violation of Section 16.3(a)(ii). *See* Opp. at 12 (citing Martinson Exs. 1-A & 9 § 16.3(a)(ii)). Owners did not seek to substantiate their burden with evidence because there is no viable evidence of same.

rights can be waived even when contract has no-waiver clause); *Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 166 (2d Cir. 1996) (affirming contractor entitled to damages because of evidence that "written notice provision was waived").[4]

Upon information and belief, REDACTED affirming that Sterling did in fact achieve Substantial Completion. *Id.* ¶¶ 22, 44. *See, e.g., Marvel Ent. Grp., Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 820 (S.D.N.Y. 1988).

**Third**, even if an administrative requirement for "Substantial Completion" remained unfulfilled, it would not be a "Contractor Event of Default" because any such failure is attributable to Owners. Under the EPC Agreements, a delay will not be a Contractor Event of Default when it is the "result of an Owner Event of Default, a Force Majeure Event, [or] an Owner-Caused Delay[.]" ECF 44.1 § 20.1(f). After March 2021, Sterling incurred costs in the amount of $81 million in Change Orders, but Owners have refused to pay for nearly all of these Owner-Caused Delays. Bhandari ¶¶ 10-12, 37-39. Moreover, numerous delays resulted from Covid-19 and the ensuing government lockdowns. Bhandari ¶¶ 6, 11-12, 39. These are Force Majeure Events, and also Owner-Caused Delays REDACTED ECF 44.1 at 18 § 1.2 (Defined Terms). Having contractually assumed these risks, Owners cannot now contend they constitute a "Contractor Event of Default."

If Owners dispute that a delay is an Owner-Caused Delay or Force Majeure Event, they must follow the procedures in Article 28, REDACTED *See* ECF 44-1 § 28.2. But until a court determines that a delay was a Contractor Event of Default versus an Owner-Caused Delay or Force Majeure Event, Owners cannot unilaterally

---

[4] Owners allege without evidence that Sterling failed to "complet[e] all Critical Items[.]" Opp. at 11. This assertion cannot be reconciled with Owners' certification that only "punch list items" remained to be completed. Bhandari ¶ 18.

declare that Sterling defaulted and draw down the letters of credit based on their own say-so.

      2.      **Owners Were Not Entitled to the Full Amount of the Draw Request.**

Even if Owners could establish that Sterling somehow failed to perform under the EPC Agreements—and they cannot—the draw requests would still be fraudulent because Owners represented that they were entitled to the ***full amount*** of the letters of credit (representing ▮ of the Contract Price for each project). This representation was false.

The EPC Agreements do not give Owners unrestricted discretion to draw down the full amount of the letters of credit. Instead, as Owners admit (Opp. at 4), letters of credit may be drawn only to recover a "Loss suffered or incurred by the Owner . . . in connection with this [EPC] Agreement." Critically, this right is further limited by the below liquidated damages provision:



ECF 44-1 § 29.2. Here, Owners do not (and cannot) allege capacity damages, because it is undisputed that both solar facilities are fully functioning and operating at full capacity. The only damages articulated by Owners are "Facility Delay Liquidated Damages" (Opp. Br. at 5, 7, 8, 11), which would at maximum, cap Owners' draw entitlement at ▮REDACTED▮, or 50% of the total amount of the letters of credit. Owners have acknowledged this in prior communications. Bhandari ¶ 32 & Ex. 16. Accordingly, Owners' representation that they were entitled to draw down the full ▮ of the Contract Price was false and therefore fraudulent, voiding the draws in their entirety, and demonstrating Sterling's likelihood of success on the merits.

The case law cited by Owners is not helpful to their position, as the facts and posture of

those cases are distinguishable.[5] Moreover, *3M Co. v. HSBC Bank USA, N.A.*, No. 16 CIV. 5984, 2016 WL 8813992, at *2 (S.D.N.Y. Oct. 21, 2016) actually supports Sterling's argument because the court there extended a TRO until the parties had completed limited discovery. *Id.* at *7-8.

B.   **Sterling Faces Irreparable Harm in The Absence of an Injunction.**

Without an injunction, Sterling faces irreparable harm as it will suffer unquantifiable losses. A drawdown will prevent Sterling from bidding on new projects, cause it to lose projects it already won, cause owners on other projects to draw down their letters of credit, and lead to layoffs.

Irreparable harm occurs when damages are "difficult to quantify." *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 129 (S.D.N.Y. 2000). Thus, "[m]ajor disruption of a business can be as harmful as its termination and thereby constitute irreparable injury." *Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 244–45 (W.D.N.Y. 2010) (quoting *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995)). Similarly, "[t]he threat that a business will suffer a significant loss of 'good will'—a matter not easily quantified—is particularly suited to a claim for injunctive relief." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 106 (E.D.N.Y. 2015), *aff'd in part, vacated in part*, 841 F.3d 133 (2d Cir. 2016).

Here, the realities of Sterling's business solidify this threat of irreparable harm—the prospective loss of good will is immeasurable. If Owners are permitted to draw on the letters of credit, Sterling's ability to obtain or extend lines of credit on other projects will be seriously impaired. Indeed, three major banks with whom Sterling does business have already advised that

---

[5] *See All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A.*, 921 F.2d 32, 36 (2d Cir. 1990) (party claimed fraud based on its attempt to unilaterally alter the terms of the contract); *Recon/Optical, Inc. v. Gov't of Israel*, 816 F.2d 854, 858 (2d Cir. 1987) (party seeking drawdown did not impede opposing party's ability to perform); *Fluor Daniel Argentina, Inc. v. ANZ Bank*, 13 F. Supp. 2d 562, 565–66 (S.D.N.Y. 1998) (party only seeking monetary losses); *ACE Am. Ins. Co. v. Banks of the Ozarks*, 2014 WL 4953566, at *7 (S.D.N.Y. Sept. 30, 2014) (case was at summary judgment stage); *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 747 (2d Cir. 1999) (same); *TC Skyward Aviation U.S., Inc. v. Deutsche Bank AG*, 557 F. Supp. 3d 477, 490) (S.D.N.Y. 2021) (same); *Semetex Corp. v. UBAF Arab Am. Bank*, 853 F. Supp. 759, 774 (S.D.N.Y. 1994) (no triable issue of fraud).

they will end their letter of credit business with Sterling if the draw requests go through. Ghorawat ¶¶ 5-14. This would have catastrophic effects on Sterling's ability to bid on projects worldwide, including a pipeline of upcoming projects in Europe, Australia, and the Middle East, and cause Sterling to lose projects it already won, as letters of credit are a necessary precondition of large-scale solar projects in the industry. *Id.* And the inability to extend lines of credit in place on other projects would cause owners on those projects to draw down their lines of credit as well, resulting in a major business disruption to Sterling, and cause other projects to sever relationships with Sterling. *Id.* ¶¶ 9, 14, 16. Just as in *ASA*, irreparable harm exists because Sterling will "not be in a position to attract new customers or to renew existing customers[.]" 757 F. Supp. at 244.

Owners argue that Sterling's harm "was done by Sterling's own actions—namely, by failing to pay its subcontractors," and therefore is a "self-inflicted" harm. Opp. at 16. This assertion distorts the record because ***any failure to pay subcontractor claims is a result of Owners' failure to pay for Change Orders.*** Sterling already went through this with Owners once, resulting in an amendment where Owners paid an **REDACTED** to resolve then-outstanding Change Orders. Bhandari ¶ 10 & ECF 44-2 & Attachment B. But since the amendment, Owners have fallen behind on Change Orders again—in the amount of over $81 million—and that caused the current subcontractor claims. *Id.* ¶¶ 27, 40. As the Second Circuit has explained, parties may not "first cause the default and then attempt to reap the benefit of the guarantee." *Rockwell*, 719 F.2d at 589.

C.     **The Balance of Equities Favors an Injunction.**

The balance of equities plainly favors Sterling. If the draw requests go through, Sterling will face serious business disruptions as described above, resulting in unquantifiable damages for which money damages are inadequate. On the other hand, Owners will suffer no prejudice from an injunction, which merely maintains the status quo—this is particularly true for a brief maintenance of the status quo to allow for an evidentiary hearing, before the letters of credit expire.

-14-

Sterling has expressed to Owners—and is willing to stipulate here—that it will extend the letter of credit until the resolution of this currently pending litigation, if doing so is a requirement for the maintenance of the status quo. Therefore, there is no risk that these funds will become unavailable to Owners ahead of this Court hearing evidence and ruling on the merits.

In addition, Owners are responsible for the subcontractor claims because they stem from Owners' repeated failures to pay Change Orders as required. Indeed, it is no accident that the subcontractors named Owners as defendants in their lawsuits. It would be inherently inequitable to put Sterling at risk because Owners defaulted on their payment obligations. Owners' contention that letters of credit should be executed quickly fails because preventing fraud is a more important interest, and thus an exception to the rule. *Rockwell*, 719 F.2d at 589; *Brenntag*, 175 F.3d at 251.

**D.**     **The Public Interest Favors an Injunction.**

Finally, the public interest will be served by preventing Owners from fraudulently drawing down on the loans. *See Bowen v. Roy*, 476 U.S. 693, 694, (1986) (acknowledging the prevention of fraud as an important public interest). As discussed above, courts have previously weighed the interests of preventing fraud and enforcing bank loans and determined that the public interest is better served through the prevention of fraud. *See, e.g., Archer Daniels Midland Co.*, 2011 WL 855936, at *5. Because Owners' draw requests are predicated on false assertions, the public interest weighs in favor of granting a preliminary injunction.

## CONCLUSION

For the reasons noted herein and in Sterling's opening papers and declarations, Sterling respectfully requests that its Motion be granted in its entirety.

Dated: New York, New York
July 17, 2023

Respectfully submitted,

*/s/ David R. Dehoney*
David R. Dehoney
ddehoney@mrllp.com
Enrico Trevisani
etrevisani@mrllp.com
**Michelman & Robinson, LLP**
605 Third Avenue, 30th Floor
New York, New York 10158
212-730-7700 – Phone
212-730-7725 – Fax

Seth E. Darmstadter
sdarmstadter@mrllp.com
Matthew R. Lasky
mlasky@mrllp.com
**Michelman & Robinson, LLP**
1 North Wacker Drive, Suite 2180
Chicago, IL 60606
312-638-5671
312-638-5672